UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | CR 04-219 JRT/FLN |
| Plaintiff, | |
| v. | REPORT & RECOMMENDATION |
| Modestas Taylor, | |
| Defendant. | |

_____

THOMAS M. HOLLENHORST, Assistant United States Attorney, for the Government.

ELLIS OLKON, Esq., OLKON & OLKON, for Defendant.

_____

In April, 2004, Defendant Modestas Taylor was in a hotel room rented for him by Richard Ivey. He was there alone when three uniformed and armed police officers knocked on the door. Less than four minutes later the policemen found crack cocaine inside the pocket of a pair of pants that were draped over a chair in the room. (Tr. 11) Thereafter Taylor was charged with possession with intent to distribute more than 5 grams of cocaine base. He made a motion to suppress statements he made during his encounter with police and to suppress the drugs they found during the search of his hotel room.

The District Court adopted the Report & Recommendation of the Magistrate Judge, and granted the suppression motions. The United States appealed. The Court of Appeals for the Eighth Circuit retained jurisdiction of the appeal, but remanded the matter to the District Court to make further findings and rulings. On June 22, 2005, the Court heard further argument on the issues the Court of Appeals requested the District Court to consider. For the reasons set forth

1

below, the Court recommends that the Court make the following further findings of fact and conclusions of law, in support of its order suppressing the evidence at issue.

# FINDINGS OF FACT

**The Witnesses**

Two witnesses testified at the suppression hearing; Bloomington Police Officer, Mathew Heinzmann, and the Defendant, Modestas Taylor. In addition to directing this Court to resolve a conflict in the testimony over how the officers came to be inside Defendant's hotel room, the Court of Appeals has directed this Court to make "specific credibility findings to determine, in detail, the circumstances of the encounter in the hotel room. These additional findings may bear on unlawful entry and on the custody questions." Heinzmann had been a Bloomington Police Officer for two years at the time of the hearing. Modestas Taylor had an 11th grade education and sometimes had difficulty reading or writing. Both swore to tell the truth. Both had the capacity to be honest and the capacity to dissemble. This Court believes both witnesses testified truthfully. With respect to the material facts, the testimony of each was largely consistent with (or at least not inconsistent with) the testimony of the other.

**Undisputed Facts**

There is no dispute that on April 24, 2004, the police received a call from the manager of the Super 8 Hotel at 7800 2nd Avenue South, Bloomington, MN, reporting that the front desk had received a large number of telephone calls from people asking for Room 301 who did not know the occupant's name, only the room number. The room had been rented by a Richard Glenn Ivey on April 23, 2004. He had paid for the room with cash. Police ran checks on Richard Ivey and found that he had two non-extraditable warrants from two different states.

It is also undisputed that around 7:30 PM, Officer Heinzmann along with two other police officers responded to the initial call and knocked on the door to Room 301. Although their weapons were not drawn, all three officers were in full uniform and each was armed. Defendant Taylor answered the door. Following a brief interrogation of Taylor inside the hotel room, the police found crack cocaine in a pair of pants lying over a lounge chair sitting next to the bed.

When they entered the room, the Police did not have any reason to arrest or detain Mr. Taylor. They knew only that the room was paid for in cash, by someone named Richard Ivey, for whom there were two non-extraditable warrants from two different states; that the manager said a large number of people called asking for the room by number; and that the person who opened the door was not Richard Ivey. The police were aware that Richard Ivey is white, the man in the room was not.

After entering the room, the officers interrogated the Defendant. During the course of the interrogation, Officer Heinzmann asked if he could look around and search the room, and defendant said go ahead.[1] While searching the hotel room, the police found crack cocaine and a set of keys in the pockets of a pair of size 40 x 30 khaki pants which had been lying on a chair. When questioned about the pants and their contents, Defendant Taylor claimed ownership of the keys but not the pants or the drugs. He stated that the pants could belong to Richard Ivey, and he did not know how his keys got in the pocket. A continued search of the pants uncovered a larger

---

[1] Defendant does not dispute that he said the Officers could search. He testified however that he did not feel he could have refused the request to search, because the policemen were already searching the room. (Tr. 29) The Court expressly believes that Defendant reasonably believed he had no choice but to consent to the search.

piece of suspected crack cocaine. After finding the second piece of crack cocaine, the police handcuffed Defendant Taylor, and formally arrested him. (Tr. 11)

It is also undisputed that after placing him under arrest, Officer Heinzmann continued his interrogation of Defendant, asking him what size pants he wore. Defendant answered size 38 x 29. Officer Heinzmann also looked at the tab of the pants Defendant was wearing and confirmed that he was wearing size 38 x 29 pants. (Tr. 17) The Government concedes that the Defendant's answer about his pants size must be suppressed.[2]

At no time did anyone tell Defendant he could leave, or that he could ask the police to leave, or that he could refuse to answer their questions. At no time, either before or after being arrested, did any of the Police Officers give Defendant any *Miranda* warnings. After the police entered the room, the testimony of both witnesses is consistent that the three officers stood around the room while Defendant was seated on the bed answering Heinzmann's questions. Defendant testified that after they entered the room, the three officers "walked me back to the bed." (Tr. 36) The Court expressly believes this testimony. The three officers remained standing. Heinzmann conducted the interrogation while the other two officers were looking around. Until he was arrested and handcuffed, at no time during this encounter was Defendant grabbed, pulled, touched, threatened or promised anything for his cooperation. (Tr. 11-12, 16, 36)

**Disputed Facts**

---

[2] At the original hearing on the suppression motions, the lawyer for the government initially argued that the statement about Defendant's pants size was admissible. After the Court recalled the Officer to the stand to clarify that he had testified that these questions came after the defendant was formally arrested and handcuffed, (Tr. 17;51) the government conceded that the evidence regarding Defendant's statements about his pants size must be suppressed. (Tr. 54)

One notable fact about which the witnesses disagreed relates to the police entry into the defendant's hotel room. Officer Heinzman testified that, "I said, well, can we come in and talk to you for a bit here, and he said sure. So we walked in, and as we were talking . . . I just asked him a bunch of questions about where is Richard." (Tr. 8) Defendant testified that, "Three police officers came into the room." When asked by his lawyer if they "just walked into your room?" Defendant replied, "Yes, they did. . . . one officer was talking to me while I was sitting on the bed, and the other two officers was looking around in the room." (Tr. 28) Under cross examination, Defendant repeated, "When I opened the door they all rushed in. . . . When I opened the door, they just barged by me. They just burst through the door." (Tr. 34-35)

The Court of Appeals has asked this Court to resolve this conflict in the testimony. Both Heinzmann and Defendant testified that the police walked in and began asking questions. Contrary to the Government's suggestion, Defendant did not invite the police into his room. When the prosecutor tried to suggest that Defendant "invited" the police into his room, Heinzmann simply responded, "I asked him if we could come in and talk to him, and he said sure." (Tr. 10) The Court finds that Heinzmann requested to enter and Defendant acquiesced. The Court concludes that because he was nervous and intimidated, Defendant simply doesn't remember this initial request.[3]

Defendant testified that at no time did he feel he could have left the room (Tr. 29), and that if he had refused to talk to the police he would have been arrested. (Tr. 34) The Court

---

[3]In light of its conclusion that Defendant was in custody throughout the interrogation inside the hotel room and because it was undisputed that no *Miranda* warnings were ever given to the Defendant, when it initially ruled upon these motions this Court concluded it was unnecessary to resolve the conflict over how the police came to be inside the room.

expressly believes Defendant's testimony in this regard and finds that Defendant reasonably believed he would have been arrested if he did not answer the policeman's questions, or had attempted to leave the room.

In an exchange with Officer Heinzmann over the size of the room, defense counsel asked, "But nobody could have really walked out that door even if they wanted to with three police officers near the door, isn't that correct?" Heinzmann answered, "No. He could have walked out." Defense counsel continued:

> Q:   "He could have walked out, and you wouldn't have stopped him?
>
> A:   No. I would have asked him why he would have walked out, but he had a freedom – – he had a free right to leave at that point."

To the extent Officer Heinzmann suggests here that Defendant would have been permitted to walk out of the hotel room while he was being interrogated, the Court expressly does not believe this testimony.

Other disagreements between the witnesses don't rise above a quibble. For example, in cross examining the Officer, Defense counsel suggested the room was "rather small," to which the officer responded that he "would say, medium to small." When asked for dimensions, the officer said he didn't measure it and didn't know the dimensions. When asked to guess, he said, " probably 15 by 20 feet maybe, maybe a little bit bigger than that. Not much." The room was furnished with a bed, a table, a lounge chair and dressers. (Tr. 19-20) In its original Report & Recommendation the Court described the hotel room as "small." The Court concludes that its characterization of the size of the room is consistent with the Officer's testimony regarding the dimensions of the room.

Defendant testified he had been drinking from a pint bottle of Jack Daniels, which was sitting on the table by the bed.  He testified he was feeling "buzzed" but not drunk. (Tr. 29-30) Officer Heinzmann did not recall seeing any liquor bottle in the room. (Tr. 11; 21-22; 24) With respect to whether there could have been a bottle of Jack Daniels in the room, Heinzmann testified, "It could have been and I could have missed it, yeah." (Tr. 22) Later he confirmed that he did not recall seeing the bottle, "If that was there, no, I don't recall."  The Court finds the defendant drank a half pint of Jack Daniels, and that Officer Heinzmann simply doesn't remember seeing the Jack Daniels bottle. (Tr. 21-22)   Defendant testified he felt intimidated and nervous; (Tr.28) Officer Heinzmann testified defendant did not appear to be nervous or concerned about the police presence. "The only time I would think he was concerned was when I asked him if we could search the room, and he kind of just looked around as he answered no, go ahead. . . ." (Tr. 15) The Court believes Defendant and expressly finds that he was nervous and intimidated by the presence of the three uniformed and armed police officers.

Defendant testified he felt he had no choice to refuse the police request to search the room, "because they was already searching the room." (Tr. 28-29) Officer Heinzmann testified, "We did not start searching the room until I asked him.  That doesn't mean to say I wasn't looking around, or the other two officers weren't looking, you know like standing around looking, but we were all standing in the same spot. You know, they were looking around, but they weren't searching.  Hence, we were looking for stuff in plain view." (Tr. 52) The Court sees no inconsistency between these statements.  The Defendant reasonably believed he had no choice but to consent to a search that, to his observation, was already in progress. While Officer Heinzmann did not consider "looking for stuff in plain view" to be a search, this subtle

7

distinction between "looking around" and "searching," was lost on the Defendant.

## CONCLUSIONS OF LAW

The Court of Appeals in a Per Curiam Opinion has remanded for a "determination of whether or not the police legally entered the hotel room after knocking on the door." In its Per Curiam, the Court of Appeals, expressly recognizes that, "even if Taylor consented to the police officers' entry, such entry does not entitle a non-consensual search of the room." Put differently, even if the officers' initial entry into the room was lawful, the subsequent search of the room might not have been. Moreover, if Defendant was in custody while being interrogated, and was not given *Miranda* warnings, any statement he made is inadmissible. *Miranda v. Arizona,* 384 U.S. 436 (1966)*; United States v. Griffin,* 922 F.2d 1343 (8th Cir. 1990). Finally, if his consent to search the room was given at a time the Defendant was in custody without probable cause to believe the Defendant had committed any crime, his consent to the search, which uncovered the drugs, was itself the product of an unlawful detention, and cannot be relied upon to validate the search. *Florida v. Royer,* 460 U.S. 491 (1983).

The Court of Appeals has directed this Court to make a determination of whether the entry itself was lawful or not, and to make specific credibility findings. Contrary to the suggestion made by the government that Defendant "invited" the officers into his room, the record is clear, Defendant made no such invitation. As set forth above, the Court finds that Heinzmann requested and Defendant acquiesced to the entry into the room. Whether the entry under these circumstances was lawful, depends upon whether the Defendant's acquiescence was voluntary.

To be voluntary, consent must be the "product of an essentially free and unconstrained

choice, rather than the product of duress, or coercion, express or implied." *United States v. Moreno,* 373 F3d 905, 910 (8th Cir. 2004) *vacated on other grounds,* 125 S.Ct. 1053 (2005)*,* see also *United States v. Bradley,* 234 F.3d 363 (8th Cir. 2001).  Voluntariness "is a question of fact to be determined from the totality of the circumstances surrounding both the environment of the encounter and the nature of the consenting party." *Moreno*, *supra*, at 910.

Under the totality of the circumstances, the Court cannot say that Defendant's initial acquiescence to the police request to enter his room was not voluntary.  As soon as the three officers all entered, however, walked the defendant back to the bed and began asking questions and looking around, this Court concludes Defendant was in custody.  He reasonably believed he was not free to leave or terminate the interrogation.

For the reasons set forth in the original Report & Recommendation, the Court concludes that Eighth Circuit precedent, in particular *United States v. Griffin, supra*, compels the conclusion that this police initiated and police dominated interrogation of the Defendant, which resulted in his arrest, was a custodial interrogation from the moment the officers entered the room.  As it is undisputed that no *Miranda* warnings were given, the statements Defendant made must be suppressed.

The government has requested that the Court reconsider its analysis in light of the more recent cases of *United States v. Czichray,* 378 F 3d 822 (8th Cir. 2005) and *United States v. Brave Heart,* 397 F3d 1035 (8th Cir. 2005)*.* The Court has reviewed those cases and finds nothing therein to alter its analysis of the custody question as set forth in the original Report & Recommendation.  Indeed, if anything, they strengthen this Court's analysis.  In each of those cases, the Eighth Circuit made clear that the *Griffin* factors are not to be applied in a ritualistic

fashion. As the Court observed in *Czichray*, "The Court must consider whether the *historical* facts, as opposed to the one-step-removed *Griffin* factors, establish custody." (Emphasis in original) 378 F3d at 828. This Court concludes that the facts as originally found and as supplemented herein, clearly establish that Defendant Taylor was in custody while he was being interrogated in his hotel room in the presence of three uniformed and armed policemen who arrived unannounced at his door to interrogate him about Richard Ivey, weapons and drugs. Unlike in *Czichray* [4] and *Brave Heart*,[5] where the suspects were told that they were not under arrest and were free to terminate the interview and leave, no such advice was ever given to Mr. Taylor.

Likewise, this Court continues to conclude that because there was no probable cause to detain the defendant, until the drugs were found in the pants, his consent to search the room, given while he was being subjected to custodial interrogation, was the product of an unlawful detention, and cannot be relied upon to validate the search. *Florida v. Royer*, *supra*.

In the alternative, the Court concludes that while Defendant's acquiescence to the police request to enter was voluntary, Defendant's consent to search the room was not voluntary. In *United States v. Moreno*, *supra*, and *United States v. Bradley*, *supra*, the Eighth Circuit has identified several factors a court should consider in deciding whether a consent to search is

---

[4]Central to the Eighth Circuit's holding in *Czichray* was that the agents informed Czichray "at least eight times that his participation in the interview was voluntary, and that he was free to ask the agents to leave his home." 378 F 3d at 826.

[5]In *Brave Heart* the interviewers made a tape recorded statement in which they asked Brave Heart if he remembered them saying: "This interview is completely voluntary and that if you didn't want to talk to us, you could've walked out either one of the doors if you wanted to?" Brave Heart's positive response was recorded and in the Record of the Hearing. 397 F3d at 1038.

voluntary. These include: the age and education of the person giving consent, whether the person was informed of their right to withhold consent, whether the person was detained and questioned for a long or short time, whether the person was threatened, physically intimidated, or punished by police, whether the person relied upon promises or misrepresentations made by the police, whether the person was in custody or under arrest when the consent was given, whether the person was in a public or secluded place, and whether the person objected or stood by silently while the search occurred. *Moreno*, *supra*, at 910 n.6.

As the Eighth Circuit expressly noted, "Even if Taylor consented to the police officers' entry, such entry does not entitle a non-consensual search of the room." Nor does Taylor's voluntary acquiescence to the police request to enter, render his subsequent consent to search the room voluntary. Applying the factors identified by the Eighth Circuit in *Moreno*, this Court finds that Defendant's consent to search the room was not voluntary. When he gave consent to search the room, the Defendant was a grown man with an 11th grade education. He was never told of his right to withhold consent. At the time he gave consent he was being detained and subjected to a custodial, albeit brief, interrogation. While he was not threatened or punished by the police before giving consent, the Court has found he reasonably was both nervous and intimidated by the three police officers in his private, secluded hotel room. He voiced no objection while the search was carried out, because he reasonably believed he had no choice but to permit the search.

Under the totality of these circumstances, the Court concludes that Defendant's consent to search his hotel room was not "the product of an essentially free and unconstrained choice." See *United States v. Moreno*, *supra*, at 910. As the consent to search was not voluntary, the

CASE 0:04-cr-00219-JRT-FLN   Doc. 52   Filed 06/30/05   Page 12 of 12

evidence found during it must be suppressed.

## RECOMMENDATION

Based upon all of the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that the Court adopt these additional Findings of Fact and Conclusions of Law in support of its ORDER suppressing Defendant's statements and the drugs found inside the hotel room on April 24, 2004.


DATED: June 30, 2005.                           s/ *Franklin L. Noel*
                                                FRANKLIN L. NOEL
                                                United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 20, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **July 20, 2005** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.